IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02158-RBJ-NRN

BLAKE PEDIGO,

Plaintiff,

v.

MR. REED,
ERIC WOODRUFF,
CORRECTIONAL HEALTH PARTNERS,
DR. TIONA,
MR. WARD, and
MS. KAUTZ,

Defendants.

---

## REPORT & RECOMMENDATION ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## (DKT. #70 and DKT. #72)

---

**N. Reid Neureiter**
**United States Magistrate Judge**

Plaintiff Mr. Blake Pedigo, who proceeds pro se[1], brings this action under 42

U.S.C. § 1983 asserting a deprivation of his constitutional rights while in the custody of

the Colorado Department of Corrections ("CDOC") at the Fremont Correctional Facility

("FCF") and the Sterling Correctional Facility ("SCF"). Specifically, Mr. Pedigo asserts

he was denied adequate medical care when Defendants refused his requests for

---

[1] The Court must construe the filings of pro se litigants liberally. *See Haines v. Kerner*,
404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).
However, the Court should not be the pro se litigant's advocate, nor should the Court
"supply additional factual allegations to round out [the pro se litigant's] complaint or
construct a legal theory on [his] behalf." *See Whitney v. New Mexico*, 113 F.3d 1170,
1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must
follow the same procedural rules that govern other litigants. *Nielson v. Price*, 17 F.3d
1276, 1277 (10th Cir. 1994).

Anterior Cruciate Ligament ("ACL") surgery and a CDOC-issued knee brace, thereby acting with deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. Mr. Pedigo had torn his ACL prior to being admitted to Colorado's correctional system, and he had been scheduled for surgery prior to his arrest and conviction.

Before the Court are summary judgment motions filed by the individual Defendants Reed, Woodruff, Tiona, Ward, and Kautz, all current or former CDOC employees (the "CDOC Defendants") (Dkt. #70), and by Defendant Correctional Health Partners ("CHP"). (Dkt. #72.) District Judge R. Brooke Jackson referred both motions to the undersigned. (Dkt. #74.)

The Court has reviewed the parties' filings and exhibits concerning both motions (Dkt. #70, #83, & #87 (Defendant CHP's motion), and Dkt. #72, #75, #76, #82, & #88 (the CDOC Defendants' Motion)), taken judicial notice of the Court's entire file in this case, and reviewed the applicable Federal Rules of Civil Procedure, statutes, and case law. The Court also heard extensive argument at a November 28, 2018 hearing. Now being fully informed, the Court respectfully RECOMMENDS that both Motions for Summary Judgment (Dkt. #70 & #72) be GRANTED.

## I.    <u>Factual Background</u>

The following facts are undisputed unless otherwise noted.

In October 2011, Mr. Pedigo tore his right ACL when he attempted to jump off a 12- or 13-foot ledge on his skateboard. (Dkt. #72-1 at 2; Dkt. #72-3 at 2 ¶ 8; and at 30.) Mr. Pedigo went to the emergency room where he was given crutches and an

immobilizer. (Dkt. #72-1 at 3-5.) In December 2011, Mr. Pedigo met with an orthopedic specialist, Dr. Cooney, who discussed and demonstrated range of motion exercises with Mr. Pedigo. (Dkt. #72-3 at 31-32.)

Over the next couple of years, Mr. Pedigo had multiple injuries to his right knee. (*Id.* at 35.) It is unclear whether he sought medical treatment for these injuries, but there are no medical records documenting them.

In late 2013 or early 2014, Mr. Pedigo re-injured his right knee in another skateboarding accident. (*Id.*; Dkt. #13 at 4.) Mr. Pedigo saw Dr. Cooney on February 18, 2014. (Dkt. #72-3 at 33.) Dr. Cooney's notes indicate Mr. Pedigo "would like to discuss surgery." (*Id.*, and at 35 ("Patient would like to consider surgery.")) His notes also state "patient has not had physical therapy," and "has not used assistive devices." (*Id.* at 33.) After discussing with Mr. Pedigo "the anticipated rehab which is extensive," Dr. Cooney scheduled Mr. Pedigo for surgery, noting Mr. Pedigo "could benefit from some preoperative rehab to optimize his quad strength as well as improve his ROM and his functional gait prior to proceeding with surgery." (*Id.* at 35; Dkt. #13 at 4.) Dr. Cooney's notes also state "[t]he risks and possible complications of ACL reconstruction and knee arthroscopy were explained to [Mr. Pedigo] today." (Dkt. #72-3 at 35.)

Just prior to the scheduled surgery, Mr. Pedigo was arrested and detained at the Boulder County Detention Center ("BCDC"). (Dkt. #13 at 4.) While at the BCDC, Mr. Pedigo asked his mother to obtain a DonJoy knee brace for him because he thought it might help stabilize his knee. (Dkt. #72-1 at 5-6.) A Boulder County jail physician authorized the DonJoy knee brace, provided Mr. Pedigo pay for it—which he did. (Dkt.

#13 at 4; Dkt. #72-1 at 5-6.) In August 2015, after his conviction, Mr. Pedigo transferred from BCDC to CDOC's Denver Reception and Diagnostic Center ("DRDC"), and brought his DonJoy knee brace with him. (Dkt. #13 at 5, 11.)

<u>Fremont Correctional Facility</u>

In September 2015, Mr. Pedigo transferred to FCF, where he initially retained his DonJoy knee brace. (Dkt. #13 at 5, 11; Dkt. #72 at 3 ¶ 8.) On his FCF intake form, Mr. Pedigo stated he had knee, leg, and back pain, and that he needed surgery on his knee. (Dkt. #72-3 at 9.)

Licensed Physician's Assistant ("PA") and CDOC Defendant Daniel Reed acted as Mr. Pedigo's primary care provider ("PCP") at FCF from approximately October 2015 through May 2016. (*Id.* at 13-28.) During this time frame, Mr. Reed saw Mr. Pedigo approximately seven times, usually for scheduled appointments, which are described in detail in Mr. Reed's medical notes. (*Id.*.) According to these notes, Mr. Pedigo also was a "no show" for two additional scheduled appointments. (*Id.* at 26, 27.)

Mr. Reed's notes indicate he first saw Mr. Pedigo on October 23, 2015. (*Id.* at 2 ¶ 12, and at 13.) At this appointment, Mr. Pedigo primarily complained of pain in both feet. (*Id.*) A "secondary c/o [complaint]" was pain in his right knee due to his torn ACL. (*Id.*) Mr. Pedigo showed Mr. Reed his "ortho notes" indicating he had an ACL tear. (*Id.* at 13.) He told Mr. Reed he constantly wore his knee brace because he had no stability without it, but that the brace might need adjusting. (*Id.*) Mr. Reed's notes indicate Mr. Pedigo would need security clearance for his knee brace ("a M punch in card"). (*Id.*)

In Mr. Reed's assessment, reflected in his notes,[2] Mr. Pedigo's reported knee pain was "out of proportion to usual ACL injury," which "should not have chronic pain." (*Id.*, and at 2 ¶ 13.) He noted the "[m]arked pain" described by Mr. Pedigo, "may be a contraindication to surgery." (*Id.* at 13.) Mr. Reed explained to Mr. Pedigo "that tightening up the joint with DJD [degenerative] changes [surgery] would increase, not decrease pain." (*Id.*, and at 2-3 ¶ 13, and at 4 ¶ 18.) Mr. Reed did not believe Mr. Pedigo would be a good candidate for ACL reconstruction surgery. (*Id.* at 2 ¶ 13.)

Because Mr. Pedigo had his brace on, and because his knee pain "was a secondary c/o [complaint] today," Mr. Reed's notes reflect he would "do more exam next visit." (Dkt. #72-3 at 13.) Mr. Reed also noted he would x-ray Mr. Pedigo's knee to "eval [sic] joint further," and review the "policy on ACL recon [sic] surgery since that requires extensive PT [physical therapy]." (*Id.*)

On November 12, 2015, Mr. Reed again saw Mr. Pedigo and reviewed his x-ray, noting "the imaging demonstrated a relatively healthy knee," and Mr. Pedigo had "[g]ood joint space, with a tiny thickening of medial joint line, ear[l]y degenerative change [arthritis]." (*Id.* at 3 ¶¶ 14, and at 15, 16.) Mr. Reed referred to his notes from the October 23, 2015 appointment "on pain and stability." (*Id.* at 15.) Mr. Pedigo was angry because no surgery had been scheduled and mentioned getting a lawyer. (*Id.*) Mr. Reed noted Mr. Pedigo "[h]as an ADA eval on 11/17/15 so will get good knee exam then" and

---

[2] A provider's medical notes "provide direct insight into [the provider's] subjective state of mind," and what he or she "subjectively believe[s]" concerning an inmate's medical condition or needs. *Mata v. Saiz*, 427 F.3d 745, 760 (10th Cir. 2005).

"[c]an review options then." (*Id.*) His notes also reflect he would review Mr. Pedigo's case with Defendant Dr. Susan Tiona, CDOC's Chief Medical Officer (CMO). (*Id.*)

Mr. Reed prepared separate notes reflecting his conversation with Dr. Tiona, indicating they discussed the fact that CDOC could not accept responsibility for Mr. Pedigo's "$11,000 knee brace," and that the knee brace presented security concerns since, if broken down, it "could be made into shanks." (*Id.* at 17.) As for security and liability concerns, CDOC policy requires that medical devices for inmates be approved by third-party administrator CHP, with whom CDOC contracts to review medical requests for outside consultation or medical equipment not available through CDOC clinical services. (*Id.* at 3 ¶ 15; Dkt. #72-4 at 2 ¶ 11.)

CHP is not a healthcare provider, and therefore does not treat or make medical diagnoses for CDOC inmates. (Dkt. #70 at 3 ¶¶2-3.) As a medical services organization, CHP's only role is to review specific requests made by CDOC healthcare providers (e.g., CDOC physicians, physician assistances, etc.) on behalf of CDOC inmates, and determine whether to grant or deny those requests based on CDOC clinical guidelines. (*Id.*) When a request is denied, the requesting provider (but not the inmate) may appeal the denial. (Dkt. #83 at 3 ¶ 5, and 4 ¶ 14.)

Mr. Pedigo's DonJoy knee brace was not a CDOC-issued brace. (Dkt. #72-4 at 1 ¶ 5.) Due to the afore-referenced policy concerning medical devices, Defendant Dr. Tiona determined Mr. Pedigo would not be allowed to keep his DonJoy brace. (Dkt. #72 at 4 ¶ 15.) Because the brace contains metal and fiberglass, it could be used to make weapons. (*Id.*; Dkt. #72-4 at 2 ¶10.) It also could hide contraband. (*Id.*; Dkt. #72 at 4 ¶

15.) Dr. Tiona did not personally evaluate Mr. Pedigo, so her decision that he could not keep his DonJoy knee brace was not a medical decision that he did not need a knee brace. (Dkt. #72-4 ¶¶ 15, 17, 19.) She also determined that *if* medically necessary, Mr. Pedigo could be issued a CDOC knee brace. (*Id.* ¶ 15.) Although Mr. Pedigo has never personally spoken with Dr. Tiona, he agrees she "is the person that made the decision to not allow [him] [his] knee brace." (Dkt. #72-1 at 18, 26.)

On November 17, 2015, Mr. Reed again evaluated Mr. Pedigo's knee, verified he had a complete disruption of his ACL, and, based in part on Mr. Pedigo's statement that he frequently fell without the brace, submitted a request to CHP for a CDOC-issued brace. (Dkt. #72 at 5 ¶ 19; Dkt. #72-3 at 18-19.) CHP denied the request based on lack of medical necessity, and Mr. Reed did not appeal the denial. (Dkt. #82 at 3 ¶ 10; Dkt. #72-3 at 20.)

Mr. Reed did, however, have Mr. Pedigo "come back" on December 23, 2015 "to discuss the previously mentioned ACL brace he brought with him," and noted Mr. Pedigo was "not wearing it anyway since it is loose now." (Dkt. #72-3 at 23.) Mr. Reed also noted that because the request for a brace from CHP had been denied, he "[o]ffered [Mr. Pedigo] [a] black elastic brace instead today, but [Mr. Pedigo] states it would not help and not interested." (*Id.*) Mr. Reed again noted that Mr. Pedigo's complaints regarding pain were "out of proportion to the x ray which has good joint space." (*Id.*) Noting Mr. Pedigo already was "[t]aking canteen Naprosyn, motrin and Tylenol," Mr. Reed also "offered elavil for chronic knee pain," but Mr. Pedigo "was not interested," and "[s]aid he would be contacting his lawyer" (although he did accept Elavil

for his neck and back pain). (*Id.*) Mr. Reed told Mr. Pedigo "he could kite message to increase dose [of his current pain medicine] to 50 mg," and noted he would "make working restriction of flat surfaces, and may sit for 10 min every 2 hr of standing." (*Id.*)

Mr. Reed continued to treat Mr. Pedigo while he was at FCF, and prepared detailed notes describing his next three appointments or conversations with Mr. Pedigo on February 9, 2016, April 18, 2016, and May 6, 2016. On February 16, 2016, Mr. Reed approved Mr. Pedigo for a cane, increased his chronic pain medicine dosage, and gave him Voltarin gel. (Dkt. #72-3 at 24.) Defendants Reed, Woodruff, Tiona (by telephone), and Warden Archuleta met with Mr. Pedigo on April 18, 2016, to discuss and explain why he could not have his DonJoy brace at FCF, that a brace is not necessary for an ACL tear, and that using a brace can actually cause harm through muscle atrophy. (Dkt. #72 at 7 ¶ 28.)

The April 18, 2016 discussion was Mr. Woodruff's only direct interaction with Mr. Pedigo. (Dkt. #75 ¶ 10.) As the HSA for FCF, Mr. Woodruff made only administrative decisions, was never involved in an inmate's medical or treatment decisions, and had no authority to override a decision made by an inmate's medical provider. (*Id.* ¶¶ 6, 12; Dkt. #72 ¶¶ 24-25.) Mr. Woodruff is not a medical provider. (Dkt. #75 ¶ 14.) His involvement with Mr. Pedigo was strictly limited to administrative purposes and, more specifically, the security issues posed by Mr. Pedigo possessing a non-CDOC-issued knee brace. (*Id.* ¶¶ 6-9, 12; Dkt. #72 ¶ 25.) Thus, Mr. Woodruff was not involved in deciding whether Mr. Pedigo's knee brace was "medically necessary," whether he could keep it, or whether he needed another knee brace. (Dkt. #72 ¶¶ 25-26; Dkt. #75 ¶¶ 10-

11.) He similarly never entered any information onto Mr. Pedigo's medical file or made any notes concerning Mr. Pedigo's physical condition or limitations. (Dkt. #75 ¶ 13.)

Mr. Reed, in his medical notes pertaining to the April 18, 2016 discussion, noted "the main reason for using a brace is instability." (Dkt. #72-3 at 25.) He specifically noted he had not observed instability in Mr. Pedigo's knee, and that "Pt [patient] has been walking without the brace with no reported instability." (*Id.*) This observation is consistent with Mr. Pedigo's deposition testimony that he can walk without his knee brace without experiencing any instability. (Dkt. #72-1 at 21.)

Mr. Pedigo missed his next two scheduled appointments with Mr. Reed. (Dkt. #72-3 at 26-27.) The last time Mr. Reed saw Mr. Pedigo was on May 6, 2016, when Mr. Pedigo was walking through the clinic. (*Id.* at 28.) Mr. Reed stopped Mr. Pedigo so he could measure him for a neoprene sleeve with Velcro straps. (*Id.*)

<u>Sterling Correctional Facility</u>

Mr. Pedigo transferred to SCF on May 31, 2016. Mr. Pedigo saw Defendant Trisha Kautz, a licensed nurse practitioner, on July 19, 2016, after he issued a kite complaining that he had serious medical issues. (Dkt. #72-6 at 1 ¶ 6, and at 9, 10.) Ms. Kautz became his PCP at SCF until in or around February 2017. (*Id.* at 4 ¶ 18.) At his July 19, 2016 appointment, Mr. Pedigo told Ms. Kautz he had a serious knee injury, needed surgery, had been scheduled for surgery but had been incarcerated, and needed a readjustment for his DonJoy knee brace, which he had brought with him to SCF. (Dkt. #72-6 at 2 ¶ 7, and at 10.) Mr. Pedigo also complained to her of stability issues. (*Id.* at 3 ¶ 12, and at 10.) Mr. Pedigo told Ms. Kautz he bought pain medication

every week from the canteen, but when she reviewed his canteen purchases, she found no recent purchases (going back to April) for pain medication. (*Id.* at 2 ¶ 7.) Ms. Kautz's medical notes reflect that Mr. Pedigo "ambulates into clinic, onto exam table without difficulty." (*Id.* at 10.)

Ms. Kautz initially submitted a request to CHP for a knee brace repair. (*Id.* at 2 ¶ 8.) She also requested an evaluation by an orthopedic specialist. (*Id.*) After discussing Mr. Pedigo's non-CDOC-issued knee brace with Dr. Tiona, Ms. Kautz revoked his brace, and submitted a request to CHP for a replacement CDOC-issued brace. (*Id.* ¶¶ 9-10.) All these requests were denied.

Ms. Kautz and Dr. Tiona discussed obtaining video footage of Mr. Pedigo's activities. (*Id.* ¶ 11.) The footage taken of Mr. Pedigo in August 2016 shows him doing, among other exercises, stair jumps—jumping four to five stairs with both legs after crouching into a squat—without any observable difficulty or stability issues. (*Id.* at 3 ¶¶ 12-13; Dkt. #76.) The video footage indicated to Ms. Kautz that Mr. Pedigo did not have structural instability that might require a knee brace. (Dkt. #72-6 at 3 ¶ 14.)

Mr. Pedigo admits he has no instability when moving in a straight line, but asserts he does have instability when he makes pivoting motions, such as twisting and turning his knee. (Dkt. #82 at 7 ¶ 27.) As a result, Mr. Pedigo re-injured his right knee on December 25, 2016, when he twisted it playing basketball while trying to pivot. (Dkt. #72-1 at 35-37.) Mr. Pedigo admits he had not been cleared to play basketball, and that he understood the risk of doing so but chose to disregard it. (*Id.* at 37.) He also

concedes he was not just shooting the ball, but was running up and down the court "attempting to play full basketball activity." (*Id.* at 46.)

At his follow-up appointment the day after his basketball injury, Mr. Pedigo asked for a cane rather than crutches because he thought it was important to put weight on his right leg and knee. (*Id.* at 37-38.) In the treating nurse's notes, however, she indicated that she instructed Mr. Pedigo to keep weight *off* his injured knee—which he disregarded because, according to Mr. Pedigo, he "knew [his] leg better than the nurse," and "believe[s] [he] know[s] better than anybody else." (*Id.* at 38.) Mr. Pedigo also declined an x-ray. (*Id.* at 39.) A week and a half after the basketball injury, Mr. Pedigo admitted to running without using crutches. (*Id.* at 40.)

On January 13, 2017, Mr. Pedigo finally agreed to an x-ray at an appointment with Ms. Kautz, which was taken on January 26, 2017. (Dkt. #72-6 at 3-4 ¶¶ 16-17.) During his January 13, 2016 appointment, Ms. Kautz discussed knee exercises with Mr. Pedigo that she believed were more appropriate than the stair jumps and other exercises he had been observed doing in August 2016, and gave him a pain management plan handout. (*Id.* at 3 ¶ 16.) Mr. Pedigo's January 26, 2017 x-ray reflected old damage, and nothing alarming. (*Id.* at 4 ¶ 17.) In or around February 2017, Mr. Pedigo was assigned to another PCP at SCF.

Defendant Gary Ward is the HSA at SCF. (Dkt. #72-10 ¶ 4.) Like Mr. Woodruff, as an HSA Mr. Ward is only involved in as an administrator with respect to clinical services, and has no authority to order specific treatments or the provision of medical services. (*Id.*; Dkt. #72 ¶ 53.) Although he is not involved in deciding whether an inmate

should consult with an outside provider, he does make sure the necessary paperwork involved in this type of request is provided to the right people. (Dkt. #72-5 ¶ 5.)

During the relevant time frame, Mr. Ward supervised Ms. Kautz but he had no authority with respect to any of her medical decisions, and his supervisory capacity was limited to things like approving time off requests and managing schedules. (*Id.* ¶¶ 6-7.) Like Mr. Woodruff, Mr. Ward is not a medical provider, and is not involved in and has no authority with respect to approving or denying treatments, or making any treatment-related decisions. (*Id.* ¶¶ 10; Dkt. #72 ¶ 54.) Although Mr. Ward answers all Step 2 Grievances, he does not evaluate them for the appropriateness of the treatment decisions, and only focuses on whether there is some administrative remedy available. (Dkt. #72-5 ¶ 12.)

Mr. Ward spoke with Mr. Pedigo regarding his complaints that he was not getting the right treatment for his knee. (*Id.* ¶ 9; Dkt. #72 ¶ 54.) Mr. Ward recollects explaining his administrative role to Mr. Pedigo. (Dkt. #72-5 ¶ 11.) Because of his purely administrative role, Mr. Ward was not involved with the decision to take away Mr. Pedigo's DonJoy knee brace or determining whether Mr. Pedigo medically needed a knee brace, or any other treatment decision relating to Mr. Pedigo's knee. (*Id.* ¶¶ 13, 16; Dkt. #72 ¶ 55.)

Defendants took Mr. Pedigo's deposition on November 30, 2017. (Dkt. #72-1.) During his deposition, Mr. Pedigo agreed he cannot say "whether surgery is appropriate given [his] condition" because he is "not a medical professional"; he just "think[s] that surgery would help [his] situation with [his] knee problem." (*Id.* at 19-20.) When asked

whether he would want surgery if it would make his pain worse, he said he would because his primary motivation in having surgery is "to be able to be more active and play sports again properly" and to "perform those activities at full capacity." (*Id.* at 20.) Mr. Pedigo conceded he does not know whether CDOC is obligated to approve ACL surgery for him so he can play sports in prison. (*Id.* at 20-21.)

In this regard, and although Mr. Pedigo in his response "dispute[s] that [his] stability issues do not hamper [his] regular daily activities" (Dkt. #82 at 8), he testified during his deposition that he is "able to walk without the brace with no instability," (Dkt. #72-1 at 21.) Other activities Mr. Pedigo does include "extensive yoga," as well as light jogging, lunging, squatting, and box jumps. (*Id.* at 29, 33.) When asked whether he still plays baseball, Mr. Pedigo responded "[i]f they have it, I will attempt to play it." (*Id.* at 46.) He testified that every day he walks around and uses stairs (*id.* at 31), which is consistent with his testimony at the November 28, 2018 hearing that he can do all daily activities such as walking, sitting, and standing, but has issues with planting and twisting. He also stated the only vigorous activity he does involves exercising and working out.

Finally, Mr. Pedigo testified during his deposition that he disagrees with the opinions and diagnoses of his CDOC providers, including Mr. Reed and Ms. Kautz, based (in part) on "studying and knowing my own personal capabilities, my own pain levels, my own general opinion on things too." (Dkt. #72-1 at 43.) But he also agreed that when he goes to CDOC's medical facilities saying, "I want surgery," CDOC medical providers see and examine him before saying they do not think he needs surgery. (*Id.* at

43-44.) And, he agreed he has never been denied access to a medical provider when he wanted one, but that those providers "don't give [him] what [he] think[s] [he] need[s]." (*Id.* at 44.) In sum, Mr. Pedigo does not agree with the treatment plans proposed by his CDOC providers. (*Id.* at 45.)

## II. <u>Legal Standards</u>

### A. <u>Summary Judgment</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). A dispute as to such fact "is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

"In applying the summary judgment standard, the court construes the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1016 (D. Colo. 2000), *aff'd*, 13 F. App'x 837 (10th Cir. 2001). "However, the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Id.* (emphasis in original). "[T]he relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

Whether there is a genuine dispute as to a material fact depends on whether the evidence presents a sufficient disagreement to require submission to a jury, or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden shifts to the nonmoving party who must demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).

The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(4), 56(e)(2), 56(e)(3). Only admissible evidence may be considered when ruling on a motion for summary judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id.* To be sure, *any* "conclusory allegations without specific supporting facts have no probative value," and thus are not "sufficient to create a genuine issue of material fact" for purposes of

defeating a motion for summary judgment. *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir.1990).

"[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotations and citation omitted). The Court is "not obligated to comb the record in order to make [Mr. Pedigo's] arguments for [him]." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

### B. Qualified Immunity

The requisite burden on summary judgment is slightly different where a defendant moving for summary judgment (here, the CDOC Defendants) asserts qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). In such cases, the burden is on the plaintiff to show: "(1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." *Id.* (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815–16 (2009)). If "the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity," and summary judgment in favor of the defendant is proper. *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir.1995).

Only if the plaintiff satisfies both prongs does the burden shift to the defendant, who then must show there is no genuine issue of material fact relevant to the immunity analysis. If the defendant fails to do so, summary judgment based on qualified immunity must be denied. *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991).

### III.    Analysis

Defendants argue they are entitled to summary judgment dismissing Mr.

Pedigo's claims against them because he cannot, as a matter of law, establish that

Defendants were deliberately indifferent to his serious medical needs, and therefore he

has failed to prove any violation of his Eighth Amendment rights. The Court agrees.

### A. Eighth Amendment Prohibition on Deliberate Indifference to an Inmate's Serious Medical Needs

"[P]rison officials violate the Eight Amendment's ban on cruel and unusual

punishment if their 'deliberate indifference to serious medical needs of prisoners

constitutes the unnecessary and wanton infliction of pain.'" *Self v. Crum*, 439 F.3d 1227,

1230 (10th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). As both the

Supreme Court and Tenth Circuit have stressed, "'inadvertent failure to provide

adequate medical care' is not enough" to prevail on an Eighth Amendment claim

alleging deliberate indifference to medical needs. *Id.* Nor does negligent diagnosis,

misdiagnosis, or negligent treatment—even if it constitutes medical malpractice—suffice

on their own to give rise to a constitutional violation. *Id.* at 1231-32.

"The test for constitutional liability of prison officials 'involves both an objective

and a subjective component.'" *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218

F.3d 1205, 1209 (10th Cir. 2000)). Mr. Pedigo must satisfy both components to survive

Defendants' summary judgment motions. Thus, while evidence that a competent doctor

would have correctly diagnosed an inmate's symptoms, or known the inmate should

have received a certain treatment, may weigh towards finding the objective component

of the analysis has been met, allowing a claim to proceed on this basis alone "is simply

incompatible with the tenets of the Eighth Amendment" because "it removes the subjective inquiry from the deliberate indifference test." *Self*, 439 F.3d at 1233.

Concerning the first component, Mr. Pedigo must produce objective evidence showing the alleged deprivation was, in fact, "sufficiently serious" to constitute a deprivation of constitutional dimension. *Id.* In the Tenth Circuit, a medical need typically is found to be "sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Sealock*, 218 F.3d at 1209). If the need for treatment would not be obvious to a lay person, then "the medical judgment of the physician" or other health care provider, "even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." *Id.*

Here, both the CDOC Defendants and CHP assume the first component of the analysis has been established solely for purposes of their motions. (Dkt. #72 at 17; Dkt. #70 at 6.)

As for the second component, Mr. Pedigo must present evidence of each prison official defendant's culpable state of mind. This subjective component is only satisfied "if the prison official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The United States Supreme Court has analogized the deliberate indifference standard to criminal recklessness. *Farmer*, 511 U.S. at 836-38.

An inference "cannot be drawn when an inmate voices a 'mere disagreement with a diagnosis of a prescribed treatment,' because the inmate has a constitutional right only to medical care—'not to the type or scope of medical care which he personally desires.'" *Sherman v. Klenke*, 653 F. App'x 580, 586 (10th Cir. 2016) (internal citations and brackets omitted). Indeed, as the United States Supreme Court has articulated, "[t]he Constitution . . . does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted).

In this same vein, "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Id.* at 592 (quoting *Winslow v. Prison Health Services*, 406 F. App'x 671, 674 (3d Cir. 2011)). Accordingly, a plaintiff inmate's "naked assertion that Defendants considered cost in treating [an inmate's] [medical need]"—for example, that a provider or gatekeeper's motivation in denying a request for a certain treatment was financial— "does not suffice to state a claim for deliberate indifference" and, in fact, are "too speculative to survive a motion to dismiss." *Id.* at 591-92. Succinctly stated, "the Eighth Amendment protects inmates from the 'infliction of punishment'—it does not give rise to claims sounding in negligence or medical malpractice." *Id.* at 586.

In short, "the subjective component presents a high evidentiary hurdle." *Self*, 439 F.3d at 1232. Therefore, "where a doctor merely exercises his considered medical judgment," the subjective component "is not satisfied, absent an extraordinary degree of

neglect." *Id.* As the *Self* court explained, "[s]o long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.* at 1233. Even "what ultimately turns out to be an incorrect medical decision to require conservative therapy, without more, does not constitute a violation of the Eighth Amendment." *Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000, 1007 (10th Cir. 2016) ("*Swan III*").

Significantly, "[i]ndividual liability under § 1983 must [also] be based on personal involvement in the alleged constitutional violation." *Sherman*, 653 F. App'x at 589. "Supervisory status alone does not create § 1983 liability. Rather, there must be an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (internal citation and quotations omitted).

Although section 1983 generally applies only to natural persons, the Supreme Court has held that municipalities may also be held liable as "persons" under it. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978). To prevail against a municipality, a plaintiff must establish (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Okla. Cnty. Bd. Of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). Thus, if a municipal employee did not commit a constitutional violation, the municipality cannot be held liable under section 1983. *Id.* In the Tenth

Circuit, a business entity (such as CHP) under contract with the state to fulfill a state function can only be liable through *Monell*'s municipal liability framework—i.e., the entity must be shown to have a policy or custom that inflicts the constitutional injury. *Dubbs v. head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

### B. <u>The CDOC Defendants</u>

Mr. Pedigo has sued the following five individuals who, at all times relevant, worked for CDOC: (1) Mr. Reed, the PA who acted as Mr. Pedigo's PCP at FCF; (2) Ms. Kautz, a Licensed Nurse Practitioner (NP), who acted as Mr. Pedigo's initial PCP at SCS (from July 2016 until in or around February 2017); (3) Mr. Woodruff, the HSA at FCF; (4) Mr. Ward, the HSA at SCF; and (5) Dr. Tiona, the Chief Medical Officer ("CMO") for CDOC.

As clarified in his response to the CDOC Defendants' summary judgment motion (Dkt. #82) and his deposition testimony, Mr. Pedigo asserts it is "medically necessary" for him to have ACL reconstruction surgery on his right knee and to be provided with a knee brace until surgery, and that each of the CDOC Defendants violated his Eighth Amendment rights by not requesting or ensuring he received surgery and/or a knee brace. According to Mr. Pedigo, "[l]eft untreated, my torn ACL has, and is, causing degenerative effects to my right knee." (Dkt. #82 ¶ 20.)

The CDOC Defendants argue summary judgment in their favor is appropriate for two primary reasons.

First, the CDOC Defendants assert qualified immunity, and argue Mr. Pedigo "cannot meet his burden in showing that CDOC Defendants violated his Eighth

Amendment constitutional rights or that Woodruff unconstitutionally retaliated against him for exercising" those rights. (Dkt. #72 at 15-16.) The also assert Mr. Pedigo "cannot demonstrate that his right to a particular procedure or treatment decision was clearly established." (*Id.*)

Second, the CDOC Defendants argue Mr. Pedigo cannot prove up his Eighth Amendment claims because he cannot establish the subjective prong of this analysis (they "concede the objective prong" for purposes of their motion). (*Id.* at 17.) As part of this argument, the CDOC Defendants argue Mr. Pedigo has failed to present adequate evidence that the medical treatments he sought—ACL reconstruction surgery and an ACL stabilizing brace[3]—are medically necessary. (*Id.* at 17-18.) They assert Mr. Pedigo's medical providers actively and appropriately treated his medical needs and, at best, Mr. Pedigo and his providers disagreed about his medical treatment—which does not constitute deliberate indifference. (*Id.* at 18-19.) With respect to Dr. Tiona and Messrs. Ward and Woodruff, the CDOC Defendants point to Mr. Pedigo's failure to present evidence of their personally participation in his treatment decisions. (*Id.* at 21.)

If Mr. Pedigo cannot prove his Eighth Amendment claim, i.e. if he fails to present a triable issue of fact on the CDOC Defendants' deliberate indifference to his serious medical needs, then the CDOC Defendants are entitled to qualified immunity.

---

[3] Although in his complaint, Mr. Pedigo also argued he had not, despite his requests, been provided with a cane, crutches, or a bottom bunk/bottom tier designation, during his deposition he stated he does not currently need and/or is no longer requesting any of these. (Dkt. #72 at 34-35, 40.)

1. <u>Daniel Reed, PA—Mr. Pedigo's PCP at FCF</u>

As previously noted, Mr. Reed is a PA who acted as Mr. Pedigo's PCP during Mr. Pedigo's time at FCF from approximately October 2015 through May 2016. According to Mr. Pedigo, "Defendant Reed was aware that [Mr. Pedigo] had MRI results showing [his] ACL tear and that [Mr. Pedigo] fit all the requirements to get surgery approved," but that "[d]espite this knowledge, Defendant Reed never sought to get [Mr. Pedigo] a surgery approval through CHP." (Dkt. #82 at 5 ¶ 18.) In other words, Mr. Pedigo argues Mr. Reed was deliberately indifference to his serious medical needs because Mr. Reed never requested surgery for Mr. Pedigo. Mr. Pedigo also faults Mr. Reed for not including Mr. Pedigo's x-rays and an assessment of them in a request to CHP for a knee brace for Mr. Pedigo, and then for not appealing CHP's denial. (*Id.* at 3 ¶ 10.)

Mr. Reed's detailed medical notes from Mr. Pedigo's appointments "provide direct insight into [Mr. Reed's] subjective state of mind." *Mata*, 427 F.3d at 760. They reflect Mr. Reed's efforts to help Mr. Pedigo manage his pain, as well as Mr. Reed's subjective belief that surgery was not necessary in light of Mr. Pedigo's symptoms and x-rays. Mr. Reed believed surgery could actually increase Mr. Pedigo's pain, and not necessarily provide him the result he desired.

Based on the above undisputed facts, and viewed in the light most favorable to Mr. Pedigo, I conclude Mr. Reed "order[ed] treatment consistent with the symptoms presented [by Mr. Pedigo] and then continue[d] to monitor [Mr. Pedigo's] condition," and, accordingly, any "inference of deliberate indifference is unwarranted." *Self*, 439 F.3d at 1232-33. Although it is true that Mr. Pedigo himself originally told Mr. Reed that,

without his brace, he felt unstable, and based on these representations, Mr. Reed requested a knee brace from CHP, Mr. Reed did not personally witness any such instability. In fact, in April 2016, Mr. Reed reported not only had he not observed any instability, but also that Mr. Pedigo "ha[d] been walking without the brace with no reported instability"—which is consistent with Mr. Pedigo's deposition testimony. Mr. Reed also provided Mr. Pedigo with an extra neoprene sleeve, measured Mr. Pedigo for a special brace with a Velcro strap around it and frontal hole for the patella, and monitored and increased Mr. Pedigo's pain medications when he reported additional pain, among other treatment measures.

As for surgery, Mr. Reed took a conservative approach to Mr. Pedigo's requests for ACL reconstruction surgery based on his examination of Mr. Pedigo's x-ray's and his belief that surgery might increase Mr. Pedigo's level of pain. It is not for this Court to second-guess the treatment approach taken by Mr. Reed. *Sherman*, 653 F. App'x at 588 (where the dispute concerns "the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors") (quoting *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).

Mr. Pedigo "has a constitutional right [] to medical care"—which I conclude Mr. Reed provided. *Id.* at 586. Mr. Pedigo does not (and did not) have a constitutional right "to the type or scope of medical care which he personally desires"—here, ACL reconstruction surgery and a specialized knee brace. *Id.*

I conclude the undisputed facts show Mr. Reed did not act with deliberate indifference towards Mr. Pedigo's serious medical needs. As a result, his Eighth

Amendment claim against Mr. Reed fails, and Mr. Reed is entitled to qualified immunity. I thus RECOMMEND that summary judgment be GRANTED in favor of Mr. Reed.

2. <u>Trisha Kautz, NP—Mr. Pedigo's PCP at SCF</u>

Mr. Pedigo asserts that although Ms. Kautz submitted requests to CHP for a replacement knee brace for Mr. Pedigo, and for "an orthopedic specialist's visit in preparation for surgery," she failed to attach to these requests adequate documentation demonstrating their medical necessity. (Dkt. #82 ¶¶ 11-12, 19.) When these requests were denied, she further failed to appeal them. (*Id.*)

A court in this district recently rejected a nearly identical argument. *Swan v. Fauvel*, No. 15-cv-00103-WJM-NYW, 2015 WL 13730873, *3 (D. Colo. Oct. 5, 2015) (Report and Recommendation of Magistrate Judge Nina Wang) ("*Swan I*"), adopted by Judge Martínez in 2015 WL 7755493 (D. Colo. Dec. 12, 2015) ("*Swan II*"). In *Swan I*, Magistrate Judge Wang found that a CDOC defendant's "fail[ure] to submit a clerically compliant request" to CHP (in that case, for an MRI) and "to pursue follow-up requests to CHP" did not constitute a violation of the plaintiff inmate's Eighth Amendment rights. Magistrate Judge Wang recommended, and Judge Martínez adopted her recommendation, that the CDOC defendant's motion to dismiss be granted. *Id.*

I find Magistrate Judge Wang's analysis in *Swan I* persuasive. Ms. Kautz's alleged failure to attach adequate documentation to her CHP requests, or to appeal the denials of those requests, does not constitute a violation of Mr. Pedigo's Eighth Amendment rights. Ms. Kautz's detailed medical notes reflect that after placing these requests to CHP, she consulted with Dr. Tiona regarding Mr. Pedigo's knee brace

situation, and observed videos of Mr. Pedigo performing stair steps and other leg exercises in which he showed no sign of having any knee instability. Ms. Kautz also continued to see and treat Mr. Pedigo, prescribing him medicine for his pain, educating him regarding exercises, and ordering an x-ray of his knee.

For the same reasons I articulate above with respect to Mr. Reed, I RECOMMEND that summary judgment in Ms. Kautz's favor be GRANTED. Based on the undisputed facts, Mr. Pedigo cannot establish the subjective prong of his Eighth Amendment claim against her, and thus Ms. Kautz is entitled to qualified immunity.

3. Eric Woodruff, HSA at FCF; and Gary Ward, HSA at SCF

Mr. Pedigo does not address his claims against either Mr. Woodruff or Mr. Ward in his response. (Dkt. #82). His only allegations regarding these individual defendants therefore are found in his complaint.

In his complaint, Mr. Pedigo asserts that Mr. Woodruff "decided that [Mr. Pedigo] did not really need a surgery or a knee brace," and "was not qualified to make this decision." (Dkt. #13 at 11.) He further asserts that "Woodruff ordered the brace to be taken, BUT, after an investigation conducted by the ADA Coordinator (after [Mr. Pedigo] complained), Woodruff was ORDERED to return the knee brace to [Mr. Pedigo]." (*Id.*; *see also id.* at 14, alleging Woodruff "violated [Mr. Pedigo's] rights by first confiscating the required knee brace without cause or authorization; and later by going around the disabilities coordinator and fabricating report to Tiona and conspiring with her in order to take the brace a second time.")

With respect to Mr. Ward, Mr. Pedigo asserts that he "personally ordered that [Mr. Pedigo] not be allowed to receive x-rays or an MRI scan," and "personally documented that [Mr. Pedigo] should not have medical apparati [sic]." (*Id.* at 16.) Mr. Pedigo also generally alleges that "Ward . . . Tiona, Woodruff, [and] Krautz" "have all at some point allowed the knee brace and recognized the need for it," and have "also acknowledged that surgery would help tremendously," but "have continuously confiscated knee brace and crutches from [Mr. Pedigo] and refuse to designate him as a bottom tier/bottom bunk inmate." (*Id.*)

These sorts of "conclusory allegations without specific supporting facts have no probative value," and thus are not "sufficient to create a genuine issue of material fact" for purposes of defeating a motion for summary judgment. *Nichols*, 921 F.2d at 1113.

Mr. Pedigo also does not dispute that, as HSAs, both Mr. Ward and Mr. Woodruff were not medical providers, did not make treatment decisions for inmates, had no authority to overrule medical or treatment decisions made by an inmate's CDOC medical provider, and were not responsible for deciding whether Mr. Pedigo should be allowed to keep his DonJoy knee brace, or whether he had a medical need for a knee brace. Mr. Pedigo agrees that Dr. Tiona—not Mr. Woodruff or Mr. Ward—made the decision that his DonJoy knee brace would not be allowed. There is no evidence whatsoever that either Mr. Ward or Mr. Woodruff were personally involved, other than in a purely administrative capacity, in the alleged constitutional violations, either denying (or even weighing in on) Mr. Pedigo's requests for surgery or his requests to keep his DonJoy knee brace or be issued a CDOC-approved knee brace.

The Court finds persuasive the analysis set forth in *Sherman* and *Swan I* as to the alleged liability of a prison HSA with respect to a medical decision that an inmate claims violated his Eighth Amendment rights. In both cases, the courts dismissed the claims against the HSAs (in *Sherman*, on summary judgment, and in *Swan I* on a motion to dismiss) because there was no evidence, or the plaintiff failed to adequately allege, that the HSA was either "personally involved with" or "responsible for [the plaintiff's] specific course of treatment." *Sherman*, 653 F. App'x at 589; *Swan I*, 2015 WL 13730873, at *6 (complaint against HSA failed to adequately plead her "personal participation" in conservative treatment of inmate with torn ACL).[4] Even where an HSA allegedly "rubber stamps" and agrees with a provider's allegedly deficient treatment (*Swan I*, at *6), or is "independently aware of [plaintiff inmate's] pain" and knows about the provider's alleged "refusal to take further steps to alleviate it" (*Sherman*, 653 F. App'x at 589), where, as here, "the undisputed evidence establishe[s] it was not within [the HSA's] authority to make treatment decisions," summary judgment in favor of the HSA is appropriate. *Id.*

Accordingly, I RECOMMEND that summary judgment in favor of Messrs. Ward and Woodruff be GRANTED because Mr. Pedigo cannot establish the subjective prong

---

[4] In *Swan I*, Magistrate Judge Wang also recommended dismissal of the inmate's claims against his CDOC medical provider because the provider "did not disregard Plaintiff's injury or fail to take reasonable measures to abate it," but rather "provided Plaintiff with an x-ray examination and metal crutches," and "also continued to examine and monitor Plaintiff's injury over a series of months." *Id.* at *3. Judge Martínez overruled plaintiff's objection to Judge Wang's recommendation and adopted it in whole. *Swan II*, 2015 WL 7755493, *1, *4.

of his Eighth Amendment claim against either as a matter of law, and therefore they are immune to these claims based on qualified immunity.

Mr. Pedigo also has alleged that Mr. Woodruff unconstitutionally retaliated against him by denying him medical treatments and devices because Mr. Pedigo filed numerous kites and grievances complaining about the denial of adequate medical care. A prison official may not retaliate against an inmate for exercising his or her constitutional rights, which include the right to file internal prison grievances. *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006). But to establish a viable retaliation claim, "a plaintiff must prove that 'but for' the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place. An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal citations and quotations omitted) (emphasis in original).

Mr. Woodruff was not involved in the denials of Mr. Pedigo's requests for surgery or a knee brace. As a result, there is no disputed issue of material fact concerning this claim, and I RECOMMEND that summary judgment be GRANTED in Mr. Woodruff's favor dismissing it.

4. Dr. Susan Tiona—CDOC CMO

Mr. Pedigo asserts Dr. Tiona violated his Eighth Amendment rights because she "had the final decision-making authority" vis-à-vis his requests for surgery and a knee brace, but failed to intervene to ensure that these requests were granted, and made the decision that his DonJoy knee brace should be taken away. Mr. Pedigo admits he has

never personally spoken with Dr. Tiona. He also has presented no evidence that Dr. Tiona was involved with making the decision as to whether a knee brace (either his DonJoy knee brace or a newly issued CDOC brace) or ACL reconstruction surgery was medically necessary. Dr. Tiona never evaluated or examined Mr. Pedigo and was not involved in decisions concerning his medical treatments. And no evidence refutes that Dr. Tiona's decision to disallow his DonJoy knee brace was based purely on policy and security reasons.

Thus Dr. Tiona, like Messrs. Woodruff and Ward, lacked the requisite personal involvement or responsibility for the course of treatment provided by Mr. Reed and Ms. Kautz necessary to impose personal liability. I also note that Mr. Pedigo has not presented any evidence that would satisfy the subjective component of the Eighth Amendment analysis, i.e., that Dr. Tiona consciously disregarded an excessive risk to Mr. Pedigo's health or safety, or acted with "criminal recklessness."

I therefore RECOMMEND that summary judgment in Dr. Tiona's favor be GRANTED, dismissing Mr. Pedigo's claims against her, because Mr. Pedigo cannot establish the subjective prong of his Eighth Amendment claim against her as a matter of law, and thus Dr. Tiona is entitled to qualified immunity.

5. CHP

Mr. Pedigo's Eighth Amendment claim against CHP for deliberate indifference to his serious medical needs in violation of the Eight Amendment pursuant to 42 U.S.C. § 1983 is based on his allegations that CHP "mishandled" medical requests submitted to it by Mr. Reed and Ms. Kautz and unreasonably failed to approve those requests. (Dkt.

#83 at 1, 5.) Mr. Pedigo argues "CHP has a policy of denying medical treatment based on profit considerations," and that this "policy of unreasonable denials resulted in my not being given any treatment for my completely torn ACL despite numerous requests from multiple Department providers." (*Id.* at 7.)

In its motion, CHP argues it is entitled to summary judgment for three reasons. First, because Mr. Pedigo "cannot establish any act of omission of CHP that caused [Mr. Pedigo's] claimed violation of his constitutional rights related to the medical treatment provided for his injury." (Dkt. #70 at 2.) Second, because Mr. Pedigo cannot establish the subjective prong of the Eight Amendment analysis. (*Id.*) And third, because Mr. Pedigo cannot show that CHP had a policy or custom that was the moving force behind the alleged constitutional deprivation. (*Id.*)

As discussed above, a business entity like CHP, which is under contract "with CDOC to review and provide prior authorization for medical care to be provided to CDOC inmates outside of the internal CDOC medical system" (*Id.* at 3 ¶ 1), can only be liable to Mr. Pedigo under the municipal liability framework established in the *Monell* case. *Dubbs*, 336 F.3d at 1216. Thus, Mr. Pedigo must establish both that a CHP employee committed a constitutional violation, and that a CHP policy or custom was the moving force behind the violation. *Myers*, 151 F.3d at 1316.

Mr. Pedigo relies heavily on the recent decision in *Swan III*[6] to argue that "CHP can be liable for the denials of treatment it makes," and that CHP "has a widespread

---

[5] In *Swan III*, the court addressed the motion for summary judgment filed by defendants CHP and its CEO and President, Dr. Stephen Krebs. After dismissal without prejudice of

practice of its employees denying treatment which would prove costly to the CDOC even when CDOC providers have provided CHP with documentation and information showing a serious medical need under their own developed policies." (Dkt. #83 at 6-7.)

The court in *Swan III*, however, did not make findings as to whether CHP had a policy or custom that was the moving force behind a constitutional violation, but rather solely addressed whether the plaintiff's allegations in his complaint were adequate to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Swan III*, 212 F. Supp. 3d at 1004. The *Swan III* plaintiff identified two alleged policies of CHP that formed the basis of his claim: "to be profitable and to provide medical services as cheaply as possible," and "to deny all (or nearly all) initial requests for MRIs, and then deny subsequent requests until other steps were taken." *Id.* at 1008. The court labeled these as "Policy A" and "Policy B," respectively. *Id.*

The *Swan III* court concluded the plaintiff could not proceed on his Policy A theory of liability because the bare allegation that CHP was motivated by financial considerations in denying medical requests made by CDOC medical providers was too speculative and did not state a claim for deliberate indifference. *Id.* at 1008-09. As for Policy B, although the court allowed the case to proceed under this theory because "[a] policy to deny initial MRI requests and require other procedures before the approval for same can be obtained is a more calculated and robust policy than one animated simply by financial considerations," *id.* at 1009, the court ultimately dismissed this claim on

---

the plaintiff inmate's claims in *Swan I* and *II*, the plaintiff filed an amended complaint only against CHP and Dr. Krebs.

summary judgment because the plaintiff presented no evidence of such a policy and, indeed, admitted there was no "formal policy." *Swan*, 2018 WL 4509528, *5 (D. Colo. Sept. 20, 2018) ("*Swan IV*").

The *Swan IV* court also rejected the plaintiff's attempt to "recharacterize[] the policy as 'put[ting] [up] significant barriers requiring all sorts of information and actions that if not complied with can result in denial." *Id.* Even assuming CHP acted under such a policy, the *Swan IV* court stated it would still be obliged to dismiss plaintiff's claim due to the "lack of necessary evidence," stating, "absent the guidance of an expert witness, a lay jury is not qualified to judge whether CHP requires unnecessary information or pointless prerequisites amounting to a policy of denying medical care for an arbitrary, non-medical reason." *Id.*

Mr. Pedigo's claim against CHP suffers from the very same infirmities. To begin, the policy alleged by Mr. Pedigo is more akin to Policy A in *Swan III* that was dismissed under Rule 12(b)(6) for failure to state a claim. An alleged policy to deny medical treatment based on profit considerations alone simply is too speculative and overly broad to survive summary judgment. In addition, Mr. Pedigo has not adduced any evidence to flesh out or substantiate a "calculated and robust policy" employed by CHP, animated by more than just financial considerations, that would suffice to state a claim for deliberate indifference. *Swan III*, 212 F. Supp. 3d at 1009. Nor did Mr. Pedigo retain any expert witness, much less one "qualified to judge whether CHP requires unnecessary information" or engages in other conduct that would demonstrate CHP denies medical requests for arbitrary, non-medical reasons.

As a result, I RECOMMEND that CHP's motion for summary judgment be GRANTED because Mr. Pedigo cannot, as a matter of law, satisfy both prongs of the requisite *Monell* analysis.

## Recommendation

Based on the above, it is hereby RECOMMENDED that Defendants' motions for summary judgment (Dkt. #70 and #72) be GRANTED.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**


Dated:      January 18, 2019
            Denver, Colorado                  N. Reid Neureiter
                                              United States Magistrate Judge